AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Blue Samsung Galaxy A16<br>Seized From Vehicle Driven by Melissa Jennelle Cota<br>FP&F: 2025565300016901-0006 | )<br>)<br>)<br>)<br>)<br>)   Case No.    25-mj-2628-SBC |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324(a)(2)(B)(ii); Title 8, U.S.C. §§ 1324(a)(1)(A)(i); Title 8, U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(I); and Title 8, U.S.C. § 1326 | Bringing in Aliens for Financial Gain; Bringing In Aliens Without Presentation; Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens in the United States; and Reentry of Removed Alien. |

The application is based on these facts:

See attached Affidavit of Roland V. Nejal, Jr., Border Patrol Agent-Intelligence, U.S. Border Patrol, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Roland Nejal BPA-A*

*Applicant's  signature*

Roland V. Nejal, Jr., Border Patrol Agent-Intelligence

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:   May 16, 2025

*Judge's signature*

City and state:   San Diego, California       Honorable Steve B. Chu, United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> A blue Samsung Galaxy A16, seized from the vehicle driven by
> Melissa Jennelle COTA
> FP&F: 2025565300016901-0006
> (**"Target Device 2"**)

**Target Device 2 is** currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, and A-9 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 5, 2025 up to and including May 6, 2025:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States and transport them within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the alien smuggling from Mexico into the United States and transport aliens within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling from Mexico into the United States and transporting aliens within the United States;

d. tending to identify travel to or presence at locations involved in the alien smuggling from Mexico into the United States and transportation of aliens within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

//

1  which are evidence of violations of Title 8, U.S.C., Sec. 1324(a)(2)(B)(ii) (Bringing

2  in Aliens for Financial Gain); Title 8, United States Code, Sections 1324(a)(1)(A)(i)

3  (Bringing In Aliens Without Presentation); Title 8, United States Code, Sections

4  1324(a)(1)(A)(ii) and (v)(I) (Transportation of Illegal Aliens and Conspiracy to

5  Transport Illegal Aliens in the United States); and Title 8, United States Code,

6  Section § 1326 (Reentry of Removed Alien).

# AFFIDAVIT

I, Roland V. Nejal Jr., U.S. Border Patrol Agent, being duly sworn, state as follows:

## INTRODUCTION

1.    I make this affidavit in support of applications for warrants to search the following cellular phones seized from a May 5, 2025, maritime human smuggling event. These cellular phones are described as follows:

    a.    A white T-Mobile Smartphone, seized from the vehicle driven by Melissa Jennelle COTA
FP&F: 2025565300016901-0005
(**"Target Device 1"**)

    b.    A blue Samsung Galaxy A16, seized from the vehicle driven by Melissa Jennelle COTA
FP&F: 2025565300016901-0006
(**"Target Device 2"**)

    c.    A gray Apple iPhone 15 Pro Max, seized from Gustavo LARA
FP&F: 2025565300016902-0002
(**"Target Device 3"**)

    d.    A white Samsung Cellphone, seized from Gustavo LARA
FP&F: 2025565300016902-0003
(**"Target Device 4"**)

    e.    A blue Samsung Cell Phone
FP&F: 2025565000007501-0001
(**"Target Device 5"**)

    f.    A black Samsung Galaxy A04, seized from Luis Armando PACHECO-Rosete
FP&F: 2025565300016904-0001
(**"Target Device 6"**)

    g.    A maroon OPPO Smartphone, seized from Juan PEREZ-Meza
FP&F: 2025565300016905-0001
(**"Target Device 7"**)

    h.    A light Blue Apple iPhone 13, seized from Alvaro Ramiro DURAN-Andrade
FP&F: 2025565300016907-0001
(**"Target Device 8"**)

    i.    A light Blue Motorola Moto G Power, seized from Jose Carmen GUZMAN-Duran
FP&F: 2025565300016908-0001
(**"Target Device 9"**)

collectively, the **Target Devices**, as further described in Attachments A-1 through A-9, respectively, and to seize evidence of crimes, contraband, fruits of a crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing a crime, specifically violations of Title 8, U.S.C., Sec. 1324(a)(2)(B)(ii) (Bringing in Aliens for Financial Gain); Title 8, United States Code, Sections 1324(a)(1)(A)(i) (Bringing In Aliens Without Presentation); Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) (Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens in the United States); and Title 8, United States Code, Section 1326 (Reentry of Removed Alien) (the "Target Offenses"), as further described in Attachment B.  The requested warrants relate to the investigation of Jesus Ivan RODRIGUEZ-Leyva ("RODRIGUEZ"), Julio Cesar ZUNIGA-Luna ("ZUNIGA"), Melissa Jennelle COTA ("COTA"), Gustavo LARA ("LARA"), and Sergio ROJAS-Fregoso ("ROJAS") for violating the immigration laws of the United States, including but not limited to the Target Offenses described above. The Target Devices are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

2.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, investigation, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.  All dates and times described are approximate.

## EXPERIENCE AND TRAINING

3.     I have been employed by U.S. Border Patrol (USBP) since 2008 and am currently assigned to the Targeting Unit-Northwest, San Diego Sector, which is tasked with investigating federal crimes involving the smuggling of humans, drugs, weapons, and other types of contraband and various other immigration and custom laws. I graduated from the

2

U.S. Border Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for nearly sixteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

4.      My current duties involve the investigation of persons involved in the inducement of illegal entry of aliens into the United States, the smuggling of illegal aliens into the United States, and the transportation and harboring of illegal aliens within the United States, including the investigation of coordination of immigration violations utilizing electronic evidence. My other duties include taking sworn statements from material witnesses and defendants, preparing reports for criminal and administrative cases, evidence collection, and seizure of personal property.

5.      In relation to the investigation of these cases, I have led and/or participated in the execution of search warrants to seize evidence of violations of federal law and arrest warrants to apprehend individuals who commit such violations. I have also participated in the issuance of subpoenas, reviewing of evidence, and conducting physical and electronic surveillance.   Through these investigative activities, I have gained a working knowledge and insight into the typical activity of human smuggling organizations, and the structure of their networks.

6.      I have training and experience as to the typical operations of human smugglers and human smuggling organizations.  Since 2018, I have participated in investigations focused on maritime smuggling utilizing panga boats and pleasure craft vessels to smuggle illegal aliens and/or narcotics into the United States. I investigate U.S.-based alien smuggling transportation cells, which serve to further transport illegal aliens into the

United States and smuggle illicit bulk currency to Mexico-based transnational criminal organizations.

7.    Through the course of my training, experience, investigations, and conversations with other law enforcement personnel experienced in alien smuggling investigations, as well as interviewing defendants and smuggled aliens, I am aware that it is a common practice for: (a) alien smugglers to work in close concert with other individuals by utilizing cellular telephones and portable radios to maintain communications with co-conspirators to further their criminal activities; and (b) the smuggled aliens to communicate with the human smugglers or a go-between by utilizing cellular telephones to further their illegal entry into the United States. Smuggling and trafficking illegal alien conspiracies generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the method and manner of the smuggling venture, arrangements of travel and payment, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators. For example, alien smugglers tasked to pick up the smuggled aliens in the United States typically are in telephonic contact with co-conspirators on the vessel and in Mexico. These communications may also include locations of stash houses and/or motels where alien smugglers harbor illegal aliens. Alien smugglers also utilize electronic communication as they transport the smuggled aliens to locations to meet with family and/or friends to complete the financial transaction, commonly referred to as "buyouts." I also know that human smugglers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications. I am also aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from organizers and drivers.

8.　　　Based on my training and experience and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

　　　　　a.　　　Human smugglers and smuggled aliens use "digital devices," including cellular telephones and smart electronic devices with messaging applications because these devices are mobile and may be secured with encryption.  In addition, these devices allow smugglers and smuggled aliens to have instant access to telephone calls, instant messaging, text messaging, social media applications, and voice messaging.

　　　　　b.　　　Human smugglers and smuggled aliens use their cellular telephones and smart electronic devices to communicate amongst each other to coordinate the logistics and payments related to the smuggling of the illegal aliens into the United States and from thereon.

　　　　　c.　　　An illegal alien or someone closely associated with this illegal alien may make contact using their cellular phones or smart electronic devices with an initial human smuggler while the illegal alien is outside of the United States.  They will discuss over the phone or via a messaging application about the logistics as to how to smuggle this illegal alien into the United States and the financial payments involved with the smuggling act.  Using the phone and/or a messaging application on the phone, this smuggler will work with other associates to coordinate how to smuggle this illegal alien along with the financial payments.  Using the phone itself or a messaging application on their phone, the smuggler or associates will advise the illegal alien or the close contact to the illegal alien about the next steps including the meet-up point.  Using the phone or messaging application, the smugglers and illegal alien may discuss the method, manner and payment at that time or after successfully smuggling the illegal alien into the United States.

　　　　　d.　　　The illegal aliens also will use their phones to make calls or send text messages to discuss the smuggling arrangements with the smugglers themselves, or a go-between such as a family member or close friend prior to and during the smuggling event.  Making their illegal entry into the United States, the smuggled aliens may use their phones

5

to continue to communicate with the smugglers or the go-between such as a family member or close friend to discuss the manner and method of the smuggling activity including the payment.

      e.    Human smugglers use digital devices to actively monitor the progress of their illegal cargo, i.e., the illegal aliens, while the vessel is in transit;

      f.    Human smugglers and their co-conspirators use cellular/mobile telephones and smart devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations both in Mexico, international waters and in the United States;

      g.    Human smugglers use digital devices to direct the human smuggler boat captains and drivers of cars to synchronize an exact drop off or pick up time of their illegal cargo;

      h.    Human smugglers use digital devices to notify or warn their co-conspirators of law enforcement activity, and in particular Custom and Border Protection (CBP) enforcement activity, to include the presence and posture of marked and unmarked units, as well as the operational status of law enforcement checkpoints.

      i.    Human smugglers use digital devices to coordinate with stash house operators regarding the logistics of housing the people they are smuggling, such as the time the smuggled people will be dropped off or picked up, a description of the vessel or vehicle transporting the smuggled illegal aliens, the number of persons in transit, the anticipated duration of their stay, and how much and when the stash house operator will be paid.

      j.    Human smugglers often keep the names, addresses, and telephone numbers of their associates on their digital devices.  Human smugglers often keep records of meetings with associates on their digital devices, including in the form of calendar entries and location data, such as GPS information, other locational information, and identifying information about the smuggler and co-conspirators and the location of previous human smuggling transactions or stash houses, and/or the identity or whereabouts of smugglers and co-conspirators involved in human smuggling.

9.     Based on my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in alien smuggling may yield evidence:

a.     tending to indicate efforts to smuggle aliens from Mexico into the United States and transport them within the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the alien smuggling from Mexico into the United States and transport aliens within the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in alien smuggling from Mexico into the United States and transporting aliens within the United States;

d.     tending to identify travel to or presence at locations involved in the alien smuggling from Mexico into the United States and transportation of aliens within the United States, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

***A.     Maritime Smuggling Event***

10.     On May 5, 2025, at approximately 7:01 a.m., the San Diego Joint Harbor Operations Center (JHOC), was notified of an overturned panga boat near Latitude 32°56'40"N, Longitude 117°15'48"W in Del Mar, California. Initial reports by bystanders

7

indicated that approximately 16 people were attempting to enter the United States illegally at the time of the event. The initial call came in at approximately 6:48 a.m. The incident was being reported by witnesses at the scene while others tried to recover the passengers from the water. Open-source video footage showed that the vessel capsized, and the passengers were thrown overboard as the vessel began to get close to shore. Ultimately, three people were found deceased, four were hospitalized, and several others were missing.

11.    Law enforcement officers from U.S. Border Patrol, U.S. Air and Marine Interdiction, Homeland Security Investigations, and U.S. Coast Guard (USCG), responded to the overturned vessel.  U.S. Border Patrol encountered two individuals near the area and, after conducting a field interview, determined the two individuals were involved in the maritime smuggling event. The two individuals, later identified as Jesus Ivan RODRIGUEZ LEYVA and Julio Cesar ZUNIGA LUNA, both Mexican Nationals, were detained and taken to San Clemente Border Patrol Station for further inspection and processing.  Defendants admitted to driving the vessel and smuggling aliens (citizens and nationals of various countries) into the United States illegally.

12.    Among the travelers, a 14-year-old male (P.P.B., an Indian national and the son of I. PATEL and S. PATEL) and Gorgonio PLACIDO-Diaz and Marcos LOZADA-Juarez, both Mexican nationals, were all found deceased. Currently, the 10-year-old daughter of I. PATEL and S. PATEL, M.P.B., remains missing. A USCG helicopter, a USCG Cutter, along with another USCG vessel and U.S. Customs and Border Protection vessels conducted a search for survivors. The search yielded negative results. Marine Interdiction Agents assigned to the San Diego Air & Marine Operations Branch conducted a search and seizure of the vessel.

13.    Jesus Ivan RODRIGUEZ LEYVA and Julio Cesar ZUNIGA LUNA were placed under arrest and a Complaint was filed charging them with violations of Title 8 U.S.C. § 1324(a)(1)(A)(i), (v)(II) and (a)(1)(B)(iv) – Bringing in Aliens Resulting in Death; and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain. *See* Case No. 25-mj-02403-JLB.

### B.    Vehicles Used in Maritime Smuggling Event Identified

14.    During their subsequent investigation, agents spoke with an officer from the California State Parks, who received information from a concerned citizen who witnessed the event. The witness reported observing two suspected illegal aliens loading into a vehicle on 7th Street in Del Mar. Agents obtained a photograph from the witness, which showed a teal green Buick sport utility vehicle (SUV) facing eastbound near 127 7th Street.

15.    The vehicle depicted in the witness's photograph matched the vehicle description of a known maritime alien smuggling load vehicle identified by the United States Border Patrol's (USBP) San Diego Sector Targeting Unit-Northwest (TU-NW) – a 2009 Buick Enclave bearing California license plate 6HTK450 (the "Buick"). Law enforcement record checks on the Buick revealed at approximately 8:00 a.m., the Buick was scanned by a commercial license plate reader (LPR) near 131 Marigold Place, Chula Vista, CA 91910.

16.    Agents from the USBP and Homeland Security Investigations (HSI) conducted surveillance of the Buick, which was parked on Flower Street near the intersection of Marigold Place in Chula Vista, CA.

17.    At approximately 8:30 p.m., HSI Special Agent (SA) A. Beckhelm observed a silver Dodge Durango bearing California license plate 8MOX593 and a White Tesla bearing California license plate 9JQW268 drive onto Flower Street and park near the Buick.

18.    Agents observed a white BMW drive next to the Tesla and Durango, double parked, and activate its hazard lights. SA Beckhelm saw several individuals disembark from the BMW and be escorted to either the Tesla or Durango.

19.    At approximately 8:32 p.m., HSI SA C. Ruiz observed a male, later identified as ROJAS, walk towards a Volvo SUV parked in front of the Buick on the south side of Flower Street and west of Rosemary Place. SA Ruiz saw ROJAS in the Volvo searching around the driver's seat. ROJAS then walked back towards where the Tesla and Durango

were parked. The BMW then left the area.  Agents followed the BMW and attempted to perform a vehicle stop; however, the BMW failed to yield and absconded.

20.    SA Ruiz observed ROJAS run on the northside sidewalk of Flower Street and run past his parked unmarked vehicle. After a brief foot pursuit, SA Ruiz caught and detained ROJAS. ROJAS was escorted back to the group. Supervisory Border Patrol Agent-Intelligence (SBPA-I) Vargas approached ROJAS, identified himself as a United States Border Patrol Agent, and conducted an immigration inspection.  Agent Vargas determined ROJAS to be a Mexican citizen without immigration documents and placed him under arrest.

21.    SA Beckhelm advised ROJAS of his Miranda Rights. ROJAS said he understood his rights and agreed to speak with agents without a lawyer present. ROJAS admitted that he is a citizen and national of Mexico and did not have documents to be in the United States. SA Ruiz asked him when he came to the United States and ROJAS said he came in by boat that morning.

22.    SA Beckhelm detained the five occupants of the Tesla, and HSI SA S. Merklein detained the occupants of the Durango.  During an immigration inspection of the occupants of the Tesla, conducted by Supervisory Border Patrol Agent-Intelligence S. Vargas, the driver, Gustavo Lara, stated that he was a United States citizen. The four other individuals, identified as Luis Armando PACHECO Rosete, Juan PEREZ-Meza, O.P.H.A., and A.J.R.L., stated they were citizens of Mexico and did not have immigration documents that would allow them to enter or remain in the United States legally.  SBPA-I Vargas arrested all five individuals.  When SA Beckhelm approached and spoke to LARA, he observed LARA with a cellular phone in his hand.

23.    A commercial tow truck company was requested to tow the Tesla for seizure. The Tesla's doors were locked and the tow truck driver requested the doors be unlocked for ease of tow. BPA-I Z. Sharp asked LARA if he would unlock his Tesla using **Target Device 3**. LARA agreed and unlocked the Tesla's door.  When BPA-I Moretti opened the door to the Tesla, he observed **Target Device 4** on the center console.

24.    At the Chula Vista Border Patrol Station, during a post-arrest interview, LARA was provided with his MIRANDA advisal and he admitted ownership of **Target Devices 3** and **4**.

25.    Border Patrol Agent-Intelligence (BPA-I) B. Moretti approached the passenger side of the Durango and observed multiple occupants.  BPA-I Moretti first questioned the driver, identified as Melissa Jannelle COTA.  BPA-I Moretti then conducted an immigration inspection of the four passengers in the Durango, later identified as Jose Carmen GUZMAN-Duran, Edilberto SANCHEZ-Saldivar, Alvaro Ramiro DURAN Andrade and E.O.B.C. Each stated that they were citizens of Mexico without immigration documents allowing them to enter or reside in the United States legally.  BPA-I Moretti arrested GUZMAN, SANCHEZ, DURAN and E.O.B.C.  BPA-I Moretti further arrested COTA, the driver of the Durango.  All the arrested individuals were transported to the Chula Vista Border Patrol Station (CHU) for processing and interviews.

### C.    Interview of Load Drivers and Material Witnesses

26.    Post-arrest, LARA was advised of his Miranda Rights, waived his rights, and agreed to provide a statement.  LARA stated he is the owner of the Tesla in which he was arrested.  LARA admitted he knew the people he had picked up in his vehicle were illegal aliens and that he was typically paid between $100 to $300 per person or depending on the location he was taking them. LARA said he was expecting to receive approximately $500 United States dollars (USD) to transport the individuals in his vehicle.

27.    LARA stated that sometimes he gets paid and at other times, he does not, depending on whether the illegal aliens arrive at their destination.

28.    BPA-I Moretti asked LARA if he owned a cellular phone and he claimed **Target Device 3** and **Target Device 4** belonged to him.

29.    BPA-I Moretti recovered **Target Devices 1** and **2** from the Durango, which had been driven by COTA.

30.    COTA and LARA were charged by Complaint with Transportation of Illegal Aliens, in violation of Title 8, U.S.C. § 1324(a)(1)(A)(ii), and ROJAS was charged with

Deported Alien Found in the United States, in violation of Title 8, U.S.C. § 1326. *See* Case No. 25-mj-02386-JLB.

### D.  Interview of Material Witnesses

31.     Agents from the Department of Homeland Security conducted interviews of the material witnesses.  The material witnesses provided the following statements:

32.     Material witness PACHECO stated that he was a citizen of Mexico, and he entered the United States by boat. He intended to work in Los Angeles, CA. PACHECO stated he made smuggling arrangements and that he was going to pay approximately 250,000.00 Mexican Pesos in smuggling fees.  PACHECO was shown a photographic line-up, and he identified ROJAS as the "load driver" who met them at the beach and instructed them to board the vehicles. He further stated he saw ROJAS at the house they were kept and that ROJAS drove and kept him in a white BMW. Lastly, PACHECO stated that ROJAS instructed him to get into a white Tesla.

33.     BPA-I Moretti asked PACHECO if he owned a cellular phone and PACHECO claimed **Target Device 6** belonged to him.

34.     Material witness Jose Velazquez-Cruz, later identified as Juan PEREZ-Meza,[1] stated he was a citizen of Mexico and did not have immigration documents to allow him to enter and remain in the United States legally. He admitted he was previously deported, excluded or removed from the United States. VELASQUEZ said he was born in Leon, Guanajuato, Mexico.  VELASQUEZ said he entered the United States by boat that morning (May 5, 2025) at around 7:00 a.m. - 8:00 a.m. He further described that he was on the boat for approximately 12 hours before they attempted to land and flipped the boat.  BPA-I Moretti asked PEREZ if he owned a cellular phone and he claimed **Target Device 7** belonged to him.

35.     Material witness GUZMAN stated he was born in Michoacan, Mexico and that he had never had any documents that would allow him to legally remain in the United

---

[1]     While this witness self-identified to agents as Jose Velazquez-Cruz at the time of his apprehension, his identity was subsequently determined to be Juan PEREZ-Meza, as charged in Case No. 25-mj-02386-JLB.

States. GUZMAN said he was going to pay $13,000 USD to be smuggled into the United States. GUZMAN stated he arrived at Rosarito, Mexico on May 4, 2025, at approximately 5:30 and 6:00 p.m.

36.     GUZMAN said there were 19 total people on the panga, two boat captains and 17 subjects. He described how the panga was capsized by a wave and said everyone from the panga struggled to get to shore.  GUZMAN stated he was picked up by an SUV and taken to a load house, where he and three other people spent the day. He further said he was transported by a female in a grey Dodge Durango.

37.     Photographic lineups containing six pictures in each lineup were presented to GUZMAN.  GUZMAN identified a photograph of COTA as the driver of the grey Dodge Durango.  GUZMAN identified a photograph of ROJAS as the man who approached COTA when she stopped at the load house prior to the arrest.  GUZMAN identified the photograph of ZUNIGA as the boat captain.  BPA-I Moretti asked GUZMAN if he owned a cellular phone and he claimed **Target Device 9** belonged to him.

38.     Material witness DURAN stated he traveled to Tijuana, Mexico for the purpose to be smuggled into the United States.  After a failed border crossing attempt through the Otay Mesa Mountains, he agreed to pay smugglers $13,000 (USD) to be smuggled through the ocean.  On May 4, 2025, he and others boarded the panga and were instructed to duck and hold on tight by the captain and co-captain.  After they arrived closer to their destination, DURAN stated the vessel came to a complete stop near the shore to allow the boat captain to communicate and coordinate with the awaiting pick up vehicle. DURAN said as the boat waited it was struck by a powerful wave that caused it to turn over with people on board.  DURAN stated that once he made it to shore, a man approached him and those near the shore and walked them to a vehicle.

39.     Photographic lineups containing six pictures each were presented to DURAN. DURAN identified a photograph of ROJAS as the man who approached him and those near the shore and escorted them to a vehicle.  DURAN identified a photograph of COTA as the person who cared for him and others with food and clothing as they waited in a

house.[2]  DURAN identified a photograph of ZUNIGA as the person who loaded fuel into the panga and instructed the group on when to board the vessel.

40.    BPA-I Moretti asked DURAN if he owned a cellular phone, and he claimed **Target Device 8** belonged to him.

41.    As noted above, on May 5, 2025, ROJAS led agents on a brief foot chase prior to his arrest.  At the time, ROJAS was searched and did not have a cellphone in his possession. Agents suspected ROJAS had discarded his cellular phone during the foot chase as they attempted to make the arrest.

42.    On May 8, 2025, Border Patrol Agents returned to 131 Marigold Street Chula Vista, CA and searched around the north sidewalk of Flower Street and west of Rosemary Place.  BPA E. Wesley found **Target Device 5**, lying in a grass field in proximity to where ROJAS was observed, and seized **Target Device 5**.

43.    Based upon my training and experience, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, addresses and location information, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the above-described individuals were using the **Target Devices** to communicate with others to further the smuggling of aliens into the United States.  Further, in my training and experience, alien smugglers may be involved in the planning and coordination of the alien smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the aliens.

44.    Based upon my training and experience, it is also not unusual for individuals, such as defendants, to attempt to minimize the amount of time they were involved in their

---

[2]    In my training and experience, I know that a caretaker figure is usually assigned by a human smuggling organization to a stash house to provide food and other items to the aliens while they are present there, as well as ensure that they stay at the house until being moved to their next destination.

smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on April 5, 2025 up to and including May 6, 2025.

## **METHODOLOGY**

45.    It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models and GPS devices using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

46.    Following the issuance of these warrants, a case agent familiar with the investigation will collect the **Target Devices** and subject them to analysis.  All forensic analysis of the data contained within the telephones, and memory cards will employ search

15

protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

47. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

48. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

## **CONCLUSION**

49. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of violations of Title 8, U.S.C., Sec. 1324(a)(2)(B)(ii) (Bringing in Aliens for Financial Gain); Title 8, United States Code, Sections 1324(a)(1)(A)(i) (Bringing In Aliens Without Presentation); Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) (Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens in the United States); and Title 8, United States Code, Section 1326 (Reentry of Removed Alien) (the "Target Offenses")

//
//
//
//
//
//
//
//
//
//

16

(the "Target Offenses").  Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 through A-9 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Roland Nejal BPA-I*

Roland V. Nejal, Jr.
Border Patrol Agent-Intelligence
U.S. Border Patrol

Subscribed and sworn to before me this 15th day of May, 2025.

HONORABLE STEVE B. CHU
United States Magistrate Judge

17